

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

SEP 11 2019

CLERK, U.S. DISTRICT COURT
By_____ Deputy

UNITED STATES OF AMERICA

v.

| | |
|---|---|
| JAMSHID NORYIAN | (01) |
| a.k.a. JAMES NORYIAN | |
| DEHSHID NOURIAN | (02) |
| a.k.a. DAVID NOURIAN | |
| CHRISTOPHER RYDBERG | (03) |
| ASHRAF MOFID | (04) |
| a.k.a. SHERRI MOFID | |
| LEYLA NOURIAN | (05) |
| LESLIE BENSON | (06) |
| MICHAEL TABA | (07) |
| ALI KHAVARMANESH | (08) |

NO. 17-CR-155-L

## SUPERSEDING INDICTMENT

The Grand Jury charges:

At all times material to this superseding indictment, unless otherwise noted:

### The Defendants, Co-conspirators, and Related Companies

1.      Ability Pharmacy, Inc. (Ability) Industrial & Family Pharmacy, Inc. (Industrial & Family) and Park Row Pharmacy, LLC. (Park Row) (collectively, the Pharmacies) were compound pharmacies doing business in Tarrant County, Texas.  Ability and Industrial & Family were S Corporations while Park Row was a Limited Liability Company.

2.      Bandoola Pharmaceutical, LLC (Bandoola), HJLM Holdings, LLC (HJLM), and Queen Shiva LLC (Queen Shiva) were companies purportedly doing business in Tarrant

County, Texas. Jade and Joy Holdings, LLC (Jade and Joy) was a company purportedly doing business in Dallas County, Texas.

3.      Defendant **Jamshid Noryian**, was an owner and operator of Ability, Industrial & Family Pharmacy, and Park Row. **Jamshid Noryian** also owned and operated Queen Shiva, Bandoola, Jade and Joy, and HJLM.

4.      Defendant **Dehshid Nourian** was a licensed pharmacist and the President of Ability, Director of Industrial & Family, and Manager of Park Row. For a period of time, he was the pharmacist-in-charge at Ability and Park Row.

5.      Defendant **Christopher Rydberg** was a Governing Person of Bandoola, the Chief Financial Officer of Ability, Vice President of Industrial & Family, Vice President of Park Row, Vice President of HJLM, and Vice President of Queen Shiva.

6.      Defendant **Ashraf Mofid** was a Governing Person of Bandoola and authorized signor for Bandoola bank accounts.

7.      Defendant **Leyla Nourian** was a licensed dentist and Managing Member of Jade and Joy, Member of HJLM, Member of Queen Shiva, and authorized signor for Bandoola bank accounts.

8.      Defendant **Leslie Benson** was a licensed physician with a primary practice in occupational medicine. **Leslie Benson** owned and operated three clinics for injured federal workers located in the Texas cities of Temple, Waco, and Fort Worth.

9.    Defendant **Michael Taba** was a licensed physician with a primary practice in orthopedic surgery.  **Michael Taba** was a member of Advanced Orthopedics located in Plano, Texas.

10.    Defendant **Ali Khavarmanesh** was the owner of Park Row.

11.    Kevin Williams was a licensed physician with a primary practice in orthopedic surgery.  Kevin Williams was the President of Ennis Orthopedics PA and the Manager of Magnum Surgical Products LLC, both located in Ennis, Texas.

12.    Person A was a physician's assistant for Company A located in Arlington, Texas.

### The Federal Employees Compensation Act (Generally)

13.    The Federal Employees Compensation Act (FECA) provided disability compensation benefits and payment for medical and rehabilitation care for civilian employees of the federal government who sustained on-the-job injuries or employment-related occupational illnesses.  FECA was a health care benefit program as defined by 18 U.S.C. § 24(b) that affected interstate commerce.

14.    FECA was administered by the Office of Workers' Compensation Programs (OWCP).  Employees were entitled to receive all medical services, appliances, or supplies, which a qualified physician prescribed or recommended and which the OWCP considered necessary to treat the work-related injury.  Benefits were only available while the effects of a work-related condition continued.

15.    When providers submitted claims to OWCP, they certified that the service for which reimbursement was sought was performed as described, necessary, appropriate, and

properly billed in accordance with accepted industry standards; similarly, when providers accepted payments from OWCP, they certified that the service for which reimbursement was sought was performed as described, necessary, appropriate, and properly billed in accordance with accepted industry standards.

16.    Beneficiaries of FECA were called "claimants."

17.    Providers submitted claims to OWCP in the Dallas Division of the Northern District of Texas.  Providers were required to keep true and accurate files for the claimants they treated and submitted claims for.

### Commercial Insurance (Generally)

18.    Commercial insurance companies, employers, and private entities offered drug plans, which were administered and operated by Pharmacy Benefit Managers ("PBMs"). A PBM acted on behalf of one or more drug plans.  Through a plan's PBM, a pharmacy could join the plan's network.

19.    A beneficiary of a privately insured drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

20.    A pharmacy could participate in a privately insured drug plan by entering into an agreement with one or more PBMs acting on behalf of a privately insured plan.  When a privately insured beneficiary presented a prescription to a pharmacy, the pharmacy submitted a claim to the PBM that represented that beneficiary's private insured drug plan. The plan or PBM then adjudicated the claim, that is, determined whether the pharmacy was entitled to payment for each claim.  If the pharmacy was entitled to payment, the PBM then

reimbursed the pharmacy. The drug plan's sponsor then reimbursed the PBM for its payment to the pharmacy made on behalf of that drug plan.

21.    Blue Cross Blue Shield (BCBS) was a private non-profit health insurance company in the State of Texas that provided health care benefits to individuals enrolled for coverage under individual and employer sponsored group plans. BCBS beneficiaries were called subscribers. The Pharmacies contracted with BCBS to provide a group health insurance plan to its employees.

22.    BCBS contracted with PBM Caremark LLC, doing business as CVS/Caremark, to administer its drug plan. BCBS and CVS Caremark relied on providers to submit true, complete, and accurate claims. Ability, Industrial & Family, and Park Row entered into agreements with CVS/Caremark to become providers and to be reimbursed for prescription drug claims they submitted to CVS/Caremark and BCBS.

23.    BCBS and CVS Caremark were health care benefit programs, defined by Title 18 United States Code, Section 24(b) that affected interstate commerce.

### Compound Drugs (Generally)

24.    In general, "compounding" is a practice in which a licensed pharmacist, or other licensed practitioners, pursuant to valid prescriptions issued by medical practitioners, combines, mixes, or alters ingredients of a drug or multiple drugs to create a drug tailored to the needs of an individual patient.

25.    Although ingredients in compound medications were generally approved by the United States Food and Drug Administration (FDA), the compound form of those medications were not.

26.    Compound drugs may be prescribed by a physician when an FDA-approved drug does not meet the health needs of a particular patient. For example, if a patient is allergic to a specific ingredient in an FDA-approved medication, such as a dye or a preservative, a compound drug can be prepared excluding the substance that triggers the allergic reaction. Compound drugs may also be prescribed when a patient cannot consume a medication by traditional means, such as an elderly patient or child who cannot swallow an FDA-approved pill and needs the drug in a liquid form that is not otherwise available.

27.    FECA and BCBS paid for compound medications when prescribed by a treating physician or licensed medical practitioner and when medically necessary.

## The Internal Revenue Service (Generally)

28.    The Internal Revenue Service is an agency of the United States Department of Treasury responsible for enforcing and administering the tax laws of the United States, and collecting taxes owed to the United States.

29.    S Corporations and Limited Liability Companies (LLC) are "flow through" entities which means the entity has elected to pass income, losses, deductions, and credits through to their shareholders or partners for federal tax purposes. Shareholders of an S Corporation and partners of an LLC report the flow-through of income and losses on their personal tax returns and are assessed tax at their individual income tax rate.

**The Scheme to Defraud**

Overview of the Scheme

30.    Defendants and others unlawfully submitted and caused to be submitted false and fraudulent claims to Federal and commercial health care programs for prescriptions for compound drugs.  Health care benefit programs paid millions of dollars on these false and fraudulent claims.  These prescriptions, as defendants knew and intended, were, among other things, not legitimately prescribed, not needed, not used, and induced through the payment and receipt of kickbacks and bribes.

31.    Over the course of, and in furtherance of, the scheme to defraud, which began no later than in or about May 2014 and continued until in or about March 2017, the exact dates being unknown to the Grand Jury, the defendants and others submitted and caused the submission of approximately $158 million in false and fraudulent claims to FECA and approximately $400,000 in false and fraudulent claims to BCBS for compound drugs that were not legitimately prescribed, not needed, not used, and induced through the payment and receipt of kickbacks and bribes.

Object/Purpose of the Scheme

32.    The object/purpose of the scheme was for the defendants and others known and unknown to the Grand Jury to unlawfully enrich themselves by submitting and causing the submission of false and fraudulent claims to FECA and BCBS for health care benefits. The false and fraudulent claims were for compound drugs that were not legitimately prescribed, not needed, not used, and induced through the payment and receipt of kickbacks and bribes.

## Acts in Furtherance of the Scheme

33.     **Christopher Rydberg, Dehshid Nourian,** and others filed and caused to be filed, Payment Information Forms for the Pharmacies to transmit payment electronically from DOL-OWCP to the Pharmacies.

34.     **Dehshid Nourian** and others entered into provider agreements on behalf of the Pharmacies with CVS Caremark to submit claims for reimbursement for goods and services provided by the Pharmacies to BCBS group plan members.

35.     **Jamshid Noryian** and others created a prescription pad to be provided to doctors referring prescriptions to the Pharmacies.  The compound creams and vitamins listed on the pad were formulated with ingredients intended to maximize reimbursement from DOL-OWCP.  The creams were for scars, wounds, and pain. The creams had DOL-OWCP reimbursement rates of up to approximately $28,000 per container.

36.     **Jamshid Noryian, Dehshid Nourian,** and **Leyla Nourian** paid kickbacks to medical professionals, including doctors treating DOL-OWCP claimants, and induced them with these kickbacks to send unnecessary and excessive prescriptions for compound medications to the Pharmacies.

37.     **Ashraf Mofid, Christopher Rydberg,** and **Leyla Nourian** operated Bandoola Pharmaceutical in order to pay kickbacks to doctors for referring prescriptions of DOL-OWCP claimants to the Pharmacies.  Defendants and others created sham "promissory notes" to make it appear as though the payments were loans instead of payments for prescriptions.

**Superseding Indictment – Page 8**

38.     **Jamshid Noryian** and **Dehshid Nourian** recruited Person A, a physician's assistant to sign prescriptions for compound medications for employees of the Pharmacies to be billed to BCBS, the group plan insurer for the Pharmacies.  Person A did not examine nor treat the employees and had no provider-patient relationship with the employees.  The employees did not want, need, or request the medications and sometimes did not even know medication had been prescribed for them.

39.     **Leyla Nourian** recruited **Michael Taba** to write prescriptions for compound medications for DOL-OWCP claimants to be filled by the Pharmacies.

40.     **Michael Taba** and **Leslie Benson** toured Ability and received prescription pads from the Pharmacies to ensure that all prescriptions written by them for compound creams would be sent to the Pharmacies.  **Michael Taba**, **Leslie Benson**, and Kevin Williams prescribed medically unnecessary pain creams when patients were already prescribed controlled substance medications for pain management.

41.     **Jamshid Noryian** controlled and attempted to control medical treatment for patients of **Michael Taba** and **Leslie Benson** by offering and providing kickbacks and bribes to clinic staff to ensure compound prescriptions were written for every patient and sent to Ability and Industrial & Family.  **Jamshid Noryian** instructed employees of Ability and Industrial & Family to contact patients and doctors and request refills when either pharmacy was not processing sufficient prescriptions.

42.     **Jamshid Noryian** offered and paid kickbacks and bribes to **Leslie Benson**, to include free rent, for writing prescriptions for medically unnecessary compound

medications to the Pharmacies. **Leslie Benson** wrote prescriptions for compound medications for all patients regardless of whether they wanted or needed the medications. **Leslie Benson** referred approximately 3,968 prescriptions for DOL-OWCP claimants to Ability and Industrial & Family. **Leslie Benson** caused approximately $20 million to be billed by Ability and Industrial & Family to DOL-OWCP.

43.    **Jamshid Noryian** maximized, and attempted to maximize, prescriptions for compound medications by contacting the office of **Michael Taba** if prescriptions had not come in that week. **Jamshid Noryian** instructed Ability and Industrial & Family employees to go to **Michael Taba's** clinic where they would work with **Michael Taba's** staff to fill out prescriptions, stamp **Michael Taba's** signature on prescriptions, and contact patients about receiving prescriptions.

44.    **Michael Taba** instructed his employees to review his patient visit schedule at the end of each day, write prescriptions for compound creams for each patient, and send the prescriptions to the Pharmacies. The medications were not tailored to the individual patient; every patient received the same compound medications.

45.    **Ashraf Mofid**, **Leyla Nourian**, and **Christopher Rydberg** signed and delivered checks to **Michael Taba** for sending prescriptions to Ability and Industrial & Family Pharmacy to be billed to DOL-OWCP.

46.    **Michael Taba** referred approximately 3,527 prescriptions for DOL-OWCP claimants to Ability and Industrial & Family. **Michael Taba** caused approximately $33 million to be billed by Ability and Industrial & Family to DOL-OWCP.

47.   **Jamshid Noryian** and **Dehshid Nourian** obtained Park Row for the purpose of filling out-of-state prescriptions written for DOL-OWCP claimants by Kevin Williams.

48.   **Jamshid Noryian** instructed his employees to deliver prefilled prescriptions to Kevin Williams's office for signature. Kevin Williams wrote prescriptions for wound and scar medications when patients did not need the medications because they had not had surgery and were not planning to have surgery.  Kevin Williams wrote prescriptions with eleven refills so that refills were automatic.

49.   **Christopher Rydberg** met Kevin Williams in a parking lot and other locations to deliver checks to him for referring prescriptions for DOL-OWCP claimants to the Pharmacies.

50.   Kevin Williams referred approximately 10,484 prescriptions to DOL-OWCP to Ability, Industrial & Family, and Park Row.  Kevin Williams caused approximately $90 million to be billed by Ability, Industrial & Family, and Park Row to DOL-OWCP.

51.   **Jamshid Noryian** closely monitored the claims submitted to DOL-OWCP, and the payments received, by checking a computer program several times a day to see the amount of money that had been billed for the day.  **Jamshid Noryian** instructed employees to text him the amount of money made at the end of the day if he was out of the office.  **Jamshid Noryian** told employees and others that he made $1,000,000 a day off of the compound medications.

52.    In furtherance of the scheme, and to accomplish its object/purpose, the conspirators committed, and caused to be committed, the submission of the false and fraudulent claims reflected in Counts Two through Nine.

## Count One
## Conspiracy to Commit Health Care Fraud
## (Violation of 18 U.S.C. § 1349 (18 U.S.C. § 1347))

53.    The Grand Jury re-alleges and incorporates by reference all previous paragraphs as if fully alleged herein.

## The Conspiracy

54.    From in or about May 2014 and continuing to in or about March 2017, the exact dates being unknown to the Grand Jury, in the Dallas Division of the Northern District of Texas and elsewhere, the defendants, **Jamshid Noryian**, **Dehshid Nourian**, **Christopher Rydberg**, **Ashraf Mofid**, **Leyla Nourian**, **Leslie Benson**, **Michael Taba**, and others did knowingly and willfully combine, conspire, confederate, and agree with each other, Kevin Williams, Person A, and with others known and unknown to the Grand Jury, to violate 18 U.S.C. § 1347, that is to knowingly and willfully devise and execute, and attempt to execute, a scheme and artifice to defraud FECA and BCBS, both health care benefit programs as defined in 18 U.S.C. § 24(b), and to obtain money and property owned by, and under the custody and control of, FECA and BCBS, by means of materially false and fraudulent pretenses, representations, and promises, in connection with the delivery of, and payment for, health care benefits, items, and services, in violation of 18 U.S.C. § 1349.

## Object/Purpose of the Conspiracy

55.    The Grand Jury re-alleges and incorporates Paragraph 32 as a description of the object/purpose of the conspiracy.

## Manner and Means of the Conspiracy

56.    In furtherance of the conspiracy and to accomplish its object/purpose, the methods, manners, and means that were used are described in Paragraphs 33 through 52 and incorporated by reference as though set forth fully herein.

**Counts Two through Nine**
**Health Care Fraud**
**(Violation of 18 U.S.C. §§ 1347 and 2)**

57.     The Grand Jury re-alleges and incorporates by reference all previous paragraphs as if fully alleged herein.

58.     From in or about May 2014 and continuing to in or about March 2017, the exact dates being unknown to the Grand Jury, in the Dallas Division of the Northern District of Texas and elsewhere, the defendants, **Jamshid Noryian**, **Dehshid Nourian**, **Leslie Benson**, and **Michael Taba** aided and abetted by others, and aiding and abetting others known and unknown to the Grand Jury, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud FECA and BCBS, both health care benefit programs as defined in 18 U.S.C. § 24(b) and to obtain by means of materially false and fraudulent pretenses, representations, and promises in connection with the delivery of, and payment for, health care benefits, items, and services, by submitting or causing the submission of false and fraudulent claims to FECA and BCBS for compound drugs, that were among other things, not legitimately prescribed, not needed, not used, and induced through the payment of kickbacks and bribes.

59.     On or about the dates specified below, in the Dallas Division of the Northern District of Texas, and elsewhere, **Jamshid Noryian**, **Dehshid Nourian**, **Leslie Benson**, and **Michael Taba**, as specified below, defendants herein, aided and abetted by others, and aiding and abetting others known and unknown to the Grand Jury, submitted or caused to be submitted, the following false and fraudulent claims to FECA and BCBS, as specified

below, for compound drugs that were, among other things, not legitimately prescribed, not needed, and not used, and induced through the payment of kickbacks and bribes, in execution of the scheme described in Paragraphs 30-31, with each claim forming a separate count:

| Count | Defendant | Bene-ficiary | RX Number | Approx. Date Filled | Approx. Billed Amount | Approx. Paid Amount | Insurance |
|---|---|---|---|---|---|---|---|
| 2 | Jamshid Noryian Dehshid Nourian | M.M. | 948636 | 2/02/2015 | $5,584.48 | $4,693.01 | BCBS |
| 3 | Jamshid Noryian Dehshid Nourian | A.G. | 948634 | 2/02/2015 | $5,584.48 | $4,693.01 | BCBS |
| 4 | Jamshid Noryian Dehshid Nourian | R.M. | 948617 | 2/02/2015 | $5,584.48 | $4,693.01 | BCBS |
| 5 | Jamshid Noryian Dehshid Nourian Leslie Benson | M.C. | 948194 | 1/23/2015 | $3,531.22 | $2,845.21 | FECA |
| 6 | Jamshid Noryian Dehshid Nourian Leslie Benson | L.S. | 952435 | 4/08/15 | $3,550.01 | $2,860.33 | FECA |
| 7 | Jamshid Noryian Dehshid Nourian Michael Taba | R.C. | 957866 | 7/07/2015 | $3,676.42 | $2,860.33 | FECA |
| 8 | Jamshid Noryian Dehshid Nourian Michael Taba | L.B. | 956511 | 6/10/2015 | $3,676.42 | $2,860.33 | FECA |
| 9 | Jamshid Noryian Dehshid Nourian Michael Taba | J.A. | 957431 | 7/01/2015 | $3,676.42 | $2,860.33 | FECA |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## Count Ten
### Conspiracy to Launder Money and Engage in Monetary Transactions in Criminally Derived Property
### (Violation of 18 U.S. C. § 1956(h))

60.    The Grand Jury re-alleges and incorporates by reference all previous paragraphs as if fully alleged herein.

61.    Beginning in or about April 2015, and continuing thereafter to in or about March 2017, the exact dates being unknown to the Grand Jury, in the Dallas Division of the Northern District of Texas and elsewhere, defendants **Jamshid Noryian, Dehshid Nourian, Christopher Rydberg, Leyla Nourian,** and **Ashraf Mofid** did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand Jury, to commit offenses against the United States in violation of Title 18, United States Code, Section 1956 and Section 1957, to wit:

(a) To knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, with the proceeds of specified unlawful activity, that is health care fraud in violation of Title 18, United States Code, Section 1347, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), and

(b) To knowingly engage and attempt to engage, in monetary transactions within the United States, by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is health care fraud, in violation of Title 18, United States Code, Section 1957.

All in violation of Title 18, United States Code, Section 1956(h).

**Counts Eleven through Sixteen**
**Money Laundering**
**(Violation of 18 U.S.C. § 1956 (a)(1)(B)(i))**

62.     On or about the dates specified in the table below, in the Dallas Division of the

Northern District of Texas and elsewhere, the defendants **Jamshid Noryian**, **Dehshid**

**Nourian**, **Christopher Rydberg**, **Leyla Nourian**, and **Ashraf Mofid** as specified below,

did knowingly conduct and attempt to conduct a financial transaction affecting interstate

and foreign commerce, to wit, transfers as reflected below, which involved the proceeds

of a specified unlawful activity, that is health care fraud, knowing that the transaction was

designed in whole and in part to conceal and disguise, the nature, location, source,

ownership, and control of the proceeds of said specified unlawful activity and that while

conducting and attempting to conduct such financial transaction knew that the property

involved in the financial transaction represented the proceeds of some form of unlawful

activity.

| Count | Defendants | Approximate Date | Description of Transaction |
|-------|-----------|------------------|----------------------------|
| 11 | **Jamshid Noryian**<br>**Dehshid Nourian**<br>**Christopher Rydberg** | January 22, 2016 | Transfer of $3,500,000.00 from Wells Fargo bank account *0302 held in the name of Industrial & Family to JP Morgan Chase bank account *9863 held in the name of Industrial & Family. |
| 12 | **Jamshid Noryian**<br>**Dehshid Nourian**<br>**Christopher Rydberg**<br>**Leyla Nourian** | January 27, 2016 | Transfer of $3,500,000.00 from JP Morgan Chase bank account *9863 held in the name of Industrial & Family into JP Morgan Chase bank account *3462 held in the name of Jade and Joy. |

| 13 | **Jamshid Noryian Christopher Rydberg Leyla Nourian Ashraf Mofid** | January 27, 2016 | Transfer of $3,500,000.00 from JP Morgan Chase bank account *3462 held in the name of Jade and Joy into Scottrade investment account *1793 held in the name of **Sherri Mofid**. |
| 14 | **Jamshid Noryian, Dehshid Nourian Christopher Rydberg** | January 11, 2016 | Transfer of $5,266,000.00 from Prosperity Bank bank account *9542 held in the name of Ability into JP Morgan Chase bank account *2280 held at in the name of Ability. |
| 15 | **Jamshid Noryian Dehshid Nourian Christopher Rydberg Leyla Nourian** | January 12, 2016 | Transfer of $5,266,000.00 from JP Morgan Chase bank account *2280 held in the name of Ability into JP Morgan Chase bank account *3462 held in the name of Jade and Joy |
| 16 | **Jamshid Noryian Dehshid Nourian Christopher Rydberg Leyla Nourian** | January 12, 2016 | Transfer of $5,266,000.00 from JP Morgan Chase bank account *3462 held in the name of Jade and Joy into Wells Fargo Bank bank account *6032 held in the name of **Dehshid Nourian**. |

All in violation of Title 18 United States Code Sections 1956(a)(1)(B)(i) and 2.

### Count Seventeen
### Conspiracy to Defraud the United States
### (Violation of 18 U.S.C. § 371)

63.    The Grand Jury re-alleges and incorporates by reference all previous paragraphs as if fully alleged herein.

64.    In or around February 2015, the exact dates being unknown to the Grand Jury, in the Dallas Division of the Northern District of Texas and elsewhere, the defendants, **Jamshid Noryian, Dehshid Nourian, Christopher Rydberg**, and **Ali Khavarmanesh** did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown to the Grand Jury, to defraud the United States by impairing, impeding, obstructing and defeating the lawful Government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment, and collection of the revenue: to wit, income taxes.

### Object/Purpose of the Conspiracy

65.    It was the object/purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by evading the collection of income taxes from the Pharmacies and themselves.

### Manner and Means of the Conspiracy

66.    The manner and means by which the defendants sought to accomplish the object/purpose of the conspiracy included, among other things:

67.    **Jamshid Noryian, Christopher Rydberg, Dehshid Nourian**, and **Ali Khavarmanesh** evaded taxes by fabricating nonexistent expenses and fraudulently

deducting them on IRS Forms 1120S for Ability, Industrial and Family, and Park Row. These false deductions resulted in total tax harm to the United States of approximately $23 million.

68.    **Christopher Rydberg** used the Pharmacies' bank accounts to purchase 214 Cashier's Checks totaling approximately $59 million (Collectively, "the Cashier's Checks") during 2015. **Christopher Rydberg** made each Cashier's Check payable to a pharmaceutical supplier or to another payee intended to suggest a business expense for the pharmacy. **Christopher Rydberg** included memos on many of the Cashier's Checks calculated to provide the appearance of business expenses, such as "pharma supplies", "shipping," and "advertising."

69.    **Christopher Rydberg** did not pay any of the Cashier's Checks to the stated payees. Instead, he either: (a) waited until early 2016 then deposited the Cashier's Checks back into the bank accounts from which they were purchased, or (b) exchanged the Cashier's Checks for new ones in the same amount, but payable to **Dehshid Nourian** or to business entities owned and controlled by **Christopher Rydberg**, **Dehshid Nourian**, and **Jamshid Noryian** which were then deposited into bank accounts held by those entities.

70.    As a result, each Pharmacies' 2015 bank records reflected **Christopher Rydberg's** sham Cashier's Check purchases but they did not reflect the subsequent redeposits or transfers. These 2015 bank records gave the false appearance that the Pharmacies actually paid funds to the Cashier's Check payees for business expenses.

71.     At the direction of **Dehshid Nourian**, **Jamshid Noryian,** and **Ali Khavarmanesh** the Pharmacies' tax return preparers relied on the misleading bank records to prepare the Pharmacies' 2015 tax returns.  Return preparers were specifically instructed to deduct the Cashier's Check transactions as business expenses.   The tax return preparers deducted the Cashier's Check transactions on the Pharmacies' 2015 Forms 1120S without knowing that they were false expenses.

72.     The tax effect of the false deductions flowed through to the 2015 Forms 1040 of the Pharmacies' shareholders and partners including **Dehshid Nourian**, and **Ali Khavarmanesh**, resulting in total unreported tax due and owing of $23 million.

## Acts in Furtherance of the Conspiracy

In furtherance of the conspiracy, and to effect the objects thereof, the following overt acts were committed in the Northern District of Texas, and elsewhere:

73.     On September 13, 2016, **Dehshid Nourian** electronically signed Industrial's 2015 Form 1120S which contained $13,699,867 in false expense deductions attributable to **Christopher Rydberg's** Cashier's Check purchases.

74.     On September 15, 2016, **Ali Khavarmanesh** signed Park Row's 2015 Form 1120S which contained $1,608,128 in false expense deductions attributable to **Christopher Rydberg's** Cashier's Check purchases.

75.     On October 6, 2016, **Ali Khavarmanesh** electronically signed his 2015 Form 1040, which declared that his 2015 income tax liability was $477,470 less than what it actually was.

76.     On October 17, 2016, **Dehshid Nourian** electronically signed his 2015 Form 1040 which declared that his 2015 income tax liability was $10,863,962 less than what it actually was.

77.     On April 14, 2015, **Christopher Rydberg** purchased a $350,000 Cashier's Check from Ability's JPMorgan Chase Bank account, made payable to the Internal Revenue Service.

78.     On April 15, 2015, **Christopher Rydberg** exchanged the $350,000 Cashier's Check for a new one made payable to **Dehshid Nourian.**

79.     On April 15, 2015, **Christopher Rydberg** deposited the $350,000 Cashier's Check into **Dehshid Nourian's** personal Wells Fargo Bank account.    The $350,000 was ultimately deducted on Ability's 2015 Form 1120S.

**Forfeiture Notice**

(18 U.S.C. §§ 981(a)(1)(C) and 982(a)(7) and 28 U.S.C. § 2461(c))

Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. 2461(c), upon conviction of the Count One offense, the defendants **Jamshid Noryian**, **Dehshid Nourian**, **Christopher Rydberg**, **Leyla Nourian**, **Ashraf Mofid**, **Leslie Benson**, and **Michael Taba**, shall forfeit to the United States, any property, real or personal, which constitutes or is derived from proceeds traceable to Count One.

Pursuant to 18 U.S.C. § 982(a)(7) and 28 U.S.C. 2461(c), upon conviction of the Counts Two through Nine offenses, the defendants **Jamshid Noryian**, **Dehshid Nourian**, **Leslie Benson**, and **Michael Taba**, shall forfeit to the United States, any property, real or personal, which constitutes or is derived from proceeds traceable to Counts Two through Nine.

Pursuant to 18 U.S. C. § 982(a)(1) and 28 U.S.C. § 2461(c), upon conviction of the Count Ten offense and Counts Eleven through Sixteen offenses, the defendants **Jamshid Noryian**, **Dehshid Nourian**, **Christopher Rydberg**, **Leyla Nourian**, and **Ashraf Mofid** shall forfeit to the United States, any property real or personal, involved in such offense, and any property traceable to Count Ten and Counts Eleven through Sixteen.

The property subject to forfeiture includes, but is not limited to:

a. The real property located at 217 Bella Riva, Austin, Texas legally described as Lot 39A BLK A Costa Bella SUBD AMENDED PLAT OF LOTS 39 & 40 to the United States;

b. The real property located at 2525 Handley Ederville Road, Richland Hills, Texas legally described as RICHLAND IND PARK Block Lot: 36A & 37 Thru 42 to the United States;

c. The real property located at 867 FM 3133, Van Alstyn, Texas legally described as G-0201 CREAGER WM A-G0201, Acres 38.972 to the United States;

d. The real property located at 6210 Campbell Road, Dallas, Texas legally described as Summerside Office Park BLK H/8206 LT 2A ACS 1.754 to the United States;

e. All funds or up to $1,815,847.21 in Wells Fargo account XXXXXX0302 held at held in the name of Industrial & Family;

f. All funds or up to $27,907.62 in JP Morgan Chase account XXXXX2280 held in the name of Ability;

g. All funds or up to $70,437.93 in JP Morgan Chase account XXXXX3462 held in the name of Jade and Joy;

h. All funds or up to $146,181.18 in JP Morgan Chase account XXXXXX7273 held in the name of Jade and Joy;

i. All funds or up to $107,041.49 in Bancorp South account XXXXXX5371 held in the name of Bandoola;

j. All funds or up to $36,343,549.27 plus any accrued interest to date in Scottrade account XXXX1793 held in the name of Sherri Mofid;

k.  All funds or up to $25,487,203.87 plus any accrued interest to date in Scottrade account XXXX7680 held in the name of Dehshid Nourian; and

l.  The defendants are notified that upon conviction, a money judgment may be imposed equal to the gross proceeds.

84.     Pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), if any of the property described above, as a result of any act or omission of the defendant:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without difficulty,

the United States intends to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

A TRUE BILL

FOREPERSON

ERIN NEALY COX
UNITED STATES ATTORNEY

ADRIENNE E. FRAZIOR
Assistant Chief
Criminal Division
Department of Justice
Texas State Bar No. 24059546
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:    202-316-0646
Email:        Adrienne.Frazior2@usdoj.gov

**Superseding Indictment – Page 28**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

THE UNITED STATES OF AMERICA

v.

| | |
|---|---|
| JAMSHID NORYIAN | (01) |
| a.k.a. JAMES NORYIAN | |
| DEHSHID NOURIAN | (02) |
| a.k.a. DAVID NOURIAN | |
| CHRISTOPHER RYDBERG | (03) |
| ASHRAF MOFID | (04) |
| a.k.a. SHERRI MOFID | |
| LEYLA NOURIAN | (05) |
| LESLIE BENSON | (06) |
| MICHAEL TABA | (07) |
| ALI KHVARMANESH | (08) |

SUPERSEDING INDICTMENT

18 U.S.C. § 1349 (18 U.S.C. § 1347)
Conspiracy to Commit Health Care Fraud
(Count 1)

18 U.S.C. §§ 1347 and 2
Health Care Fraud
(Counts 2, 3, 4, 5, 6, 7, 8, and 9)

18 U.S. C. § 1956(h)
Conspiracy to Launder Money and Engage in Monetary Transactions in Criminally
Derived Property
(Count 10)

18 U.S.C. § 1956 (a)(1)(B)(i)
Money Laundering
(Counts 11, 12, 13, 14, 15, and 16)

18 U.S.C. § 371
Conspiracy to Defraud the United States

18 U.S.C. §§ 981(a)(1)(C) and 982(a)(7) and 28 U.S.C. § 2461(c)
Forfeiture Notice

16 Counts

A true bill rendered

------------------------------------------------------------------------

DALLAS                                                 FOREPERSON
Filed in open court this ⧵⧸ day of September, 2019.

------------------------------------------------------------------------

**No Warrant Needed**

------------------------------------------------------------------------

UNITED STATES MAGISTRATE JUDGE
No Criminal Matter Pending